WESTINGHOUSE AIR-BRAKE CO. v. NEW YORK AIR-BRAKE CO. et al.

(Circuit Court of Appeals, Second Circuit. July 18, 1899.)

No. 660.

1. PATENTS—CONSTRUCTION OF CLAIMS—IMPROVEMENTS IN AIR BRAKES.

The Westinghouse patent, No. 538,001, for an improvement in air brakes, describes in the specification an alteration in the perfected system of the inventor embodied in his prior patents, Nos. 360,070 and 376,837, being a departure from the devices therein shown only in respect to the means used for venting the train pipe into the brake cylinder. The invention, therefore, is not of a primary character, and the claims of the patent must be limited to a piston attached to, or moved by, the brake-cylinder piston, for venting the train pipe into the brake cylinder, and are not infringed by a venting device which is operated independently of the brake-cylinder piston, and vents the train-pipe air into the atmosphere.

2. SAME—INFRINGEMENT.

The Dixon patent, No. 382,032, for an improvement in air brakes, does not disclose an invention of a primary or important character, which entitles its claims to a broad construction, but describes, in claims 3 and 5, modifications of the prior Westinghouse patents, by venting the train pipe locally into the atmosphere, instead of into the brake cylinder. The venting mechanism described is operated by, and dependent on, the piston of the Westinghouse patent, No. 360,070, and the patent does not control analogous modes of venting to the atmosphere in different air-brake systems.

Lacombe, Circuit Judge, dissenting, de Westinghouse patent, No. 538,001.

Appeal from the Circuit Court of the United States for the Southern District of New York.

The complainant brought its bill in equity in the circuit court for the Southern district of New York, which was founded upon the alleged infringement of claims 1, 3, 4, 5, and 6 of letters patent No. 538,001, dated April 23, 1895, issued to George Westinghouse, Jr., and of claims 3 and 5 of letters patent No. 382,032, dated May 1, 1888, and issued to Theron S. E. Dixon. Each patent was for improvements in air brakes for railroad cars. The case came to final hearing, and from decree of dismissal of the bill this appeal was taken. 87 Fed. 882.

Fredk. H. Betts, for appellant.

Fredk. P. Fish, for appellees.

Before LACOMBE and SHIPMAN, Circuit Judges, and THOMAS, District Judge.

SHIPMAN, Circuit Judge. The Westinghouse patent, No. 538,-001, hereinafter called the "patent of 1895," was an improvement upon the quick-action air brakes, described in letters patent 360,070 and 376,837, which were issued to Mr. Westinghouse, and which have frequently been the subject of litigation in the federal courts. It is well known that the device of No. 376,837 has gone into universal use, and has been the standard quick-action air brake upon long freight trains in this country. The history of air-brake invention is given in Westinghouse v. Brake Co., 170 U. S. 537, 18 Sup. Ct. 707; but, in order to understand the relation of the invention described in the patent of 1895 to the preceding art, it is not necessary to go beyond the years 1886 and 1887. That history was given

in Westinghouse Air-Brake Co. v. New York Air-Brake Co., 11 C. C. A. 528, 63 Fed. 962, and is as follows:

"The promptness with which an automatic air-brake system could be made effectual depended upon the promptness with which air pressure in the train pipe could be reduced, and the equalization of pressure could be changed. Before the series of inventions originated by the Burlington trials, this reduction had been effected in passenger trains of ordinary length by 'venting' the train pipe, or opening a port from the train pipe to the open air, which was initiated by a turn of the engineer's valve on the locomotive. Westinghouse, in his attempt to create efficient and immediate service upon each car of a long train, enlarged the venting system, so that, when the reduction of train-pipe pressure had commenced by the turn of the engineer's valve, the triple valve under each car should also vent the train pipe of that car. Each car, therefore, contained its own venting mechanism, and, as the mechanism did its work upon its own car, it hastened the work upon the car next in the rear. Westinghouse also sought to save, and did save, power by compelling the compressed air thus vented to pass into the brake cylinder, instead of into the open air. But sudden and large reduction of pressure is only to be used in a case of emergency, and therefore means for such reduction must be made supplementary to the means for the ordinary service of the brakes, so that ordinary and extraordinary use of the brakes can each be made available, as necessity arises. The method in No. 360,070 was to make the ordinary range of motion of the triple-valve piston, which was produced by a reduction of train-pipe pressure of a few pounds, do the ordinary work of 'braking' a train, and to make an extraordinary range of motion throughout the entire length of its capacity for travel, which was produced by a reduction of 15 to 20 pounds, do the extraordinary work which gave to the brake the name of 'quick-action.' When the piston of the triple valve moved through the entire length which it could travel, the stem of the piston came in contact with the stem of the emergency valve, opened it, which uncovered a port, and thereby the train-pipe pressure was vented into the brake cylinder. The claims of the patent call the first or ordinary range of motion of the piston 'a preliminary traverse,' which admits air from the auxiliary reservoir to the brake cylinder, and the second range of motion 'a further traverse,' which enables the piston to admit air directly from the main pipe to the brake cylinder."

The defect in this invention, which was that the port which was opened by the emergency valve was necessarily restricted in size, was remedied in No. 376,837, which abandoned reliance upon the piston of the triple valve as the means of opening the emergency valve, and used a supplementary piston, contained in a supplementary chamber, and actuated by pressure from the auxiliary reservoir. The port through which, when uncovered, this pressure passes, is, in the mechanism shown in the specification, uncovered by the excess stroke of the triple-valve piston. The mode of operation is described as follows:

"When an emergency stop is to be made, the engineer throws his engineer's valve wide open, thereby causing a sudden and material reduction of pressure. The excess of the auxiliary reservoir pressure then forces the main piston stem against said other stem, overcoming the tension of its spring, drives the main piston to the extreme limit of its stroke, and thereby uncovers the ports leading from the auxiliary reservoir to the supplemental valve chamber. This pressure drives the supplemental piston outwardly, or downwards, against the stem of the supplemental valve, and forces it from its seat. Thereupon, the preponderance of train-pipe pressure in the brake pipe opens the check valve, and the air from the train pipe rushes directly from the brake pipe to the brake cylinder."

A quick, and, so far as possible, a simultaneous, action of the brakes on each car depends upon quick and simultaneous action in

the reduction of train-pipe pressure. This was partially accomplished in No. 360,070 by the port from train pipe to brake cylinder, the novel feature of the invention of that patent, and was much more fully accomplished in the invention of No. 376,837 by means of the new piston, actuated by auxiliary reservoir pressure. In each device, the emergency port was from train pipe to brake cylinder, and the particular means by which it was uncovered in each device was the excess stroke of the triple-valve piston. The reason for venting into the brake cylinder will be adverted to hereafter.

In 1892, Mr. Westinghouse made a new invention, which modified or changed the means by which he had uncovered the opening into the brake cylinder. Instead of using a "further traverse" of the triple-valve piston to uncover the emergency valve of No. 360,-070, and the excess stroke of that piston, which uncovered the port through which auxiliary reservoir pressure passed, in No. 376,837, he vented the train-pipe air into the brake cylinder by the use of a compound piston connected to the brake-cylinder piston. A valve in a passageway leading directly from the train pipe to the brake cylinder controlled the discharge of air from the train pipe. Prof. Parke, one of the complainant's experts, says:

"This valve is immediately operated by a piston under the influence of a motive power produced by the movement of another piston. In other words, the train-pipe vent valve of the device of patent No. 538,001 is operated by a compound piston, the movement of one part of which may be made to produce a motive power which will cause the other part to open the vent valve."

The piston which operates the vent valve "is subjected only to such an operative pressure as can be created by the rapid movement of another piston." The speed of the operative piston, rather than its length of movement, is the means by which the vent valve is opened, and train-pipe air is promptly vented. The best description of the method of operation of the compound piston is contained in the brief of the counsel for the complainant, and is as follows:

"In case it is desired to apply the brakes slowly or partially, for a 'service application,' the train-pipe pressure is gradually lowered by the engineer, which causes the triple valve to slowly vent auxiliary reservoir air to the brake cylinder through the graduating valve, resulting in a corresponding slow movement of the varying speed piston. When this slow movement of the varying speed piston takes place, air will pass through the small equalizing passage, 23, and maintain practically the same air density between and outside the two pistons; thereby permitting the varying speed piston to move without moving the secondary piston, and consequently resulting in not opening the train-pipe vent valve. If, however, an 'emergency' application of the brakes is to be made, the train-pipe pressure is suddenly lowered by the engineer, which causes the triple valve to rapidly vent auxiliary reservoir air to the brake cylinder, through the auxiliary reservoir emergency valve, causing a corresponding quick movement of the varying speed piston. Under such conditions, the air has not time to equalize between the pistons, as the small equalizing passage, 23, is not of sufficient area to permit of the same. Consequently a momentary partial vacuum will be formed in the chamber, G, and the action thereof will be to cause the secondary piston to move with the varying speed piston, unseating the train-pipe vent valve, the latter being attached to the secondary piston, thereby venting the air from the train pipe."

An application for this patent was filed on March 21, 1892. Changes were made in the claims, and the application lay in the office

96 F.—63

for about three years, but there was no suggestion that the invention had a broader scope than a new method of venting the air to the brake cylinder, until after March 6, 1895, when the defendant's counsel sent to the complainant's counsel for their examination a statement and description of the new air-brake machinery, which the defendant proposed to adopt, and by which the train-pipe air was vented into the atmosphere. Thereupon, as it was deemed that the atmospheric venting employed the compound-piston method of venting into the brake cylinder which was contained in the pending application of March, 1892, six new claims were caused to be added to the application, which, by the use of general language, enlarged the claims so as to make them apply to the device, wherever used in air brakes. This amendment was allowed, and the patent was issued accordingly. Claims 1 to 6 are the amended, and claims 7 and 13 are the restricted, claims.

The contention on the part of the complainant is that the invention was actually of a broad and primary character, and was "a train-pipe vent valve directly operated by a piston, which is the secondary part of a compound piston so organized that the opening of the vent valve is dependent upon the manner or rate of movement of the primary part of such compound piston." The defendant is of the opinion that the mode by which the train pipe is vented to the brake cylinder constituted the scope of the invention. It is not denied that the invention, thus defined, is novel and patentable. It is urged by the complainant that the inventor had, when he made his application, the mental conception of a broad invention, because he said in his specification:

"As in my several letters patent before referred to [360,070, 376,837, 448,827], my present improvement operates to locally exhaust air from the train pipe, to cause a great and rapid reduction of train-pipe pressure, and this effect is not dependent on the subsequent disposition of the air, as it may be permitted to escape to the atmosphere, to a separate chamber, or to the brake cylinder."

He did not, however, tell or consider how it might be permitted to escape to the atmosphere, or to a separate chamber, because neither modification was a part of the invention which he wished to present to the public. The progressive history of his invention shows that such delivery was not, in his opinion, the one most beneficial for quick-action air brake purposes, and he added:

"There is, however, a great advantage obtained by exhausting the train-pipe air into the brake cylinder, because the final pressure obtained in the brake cylinder, after the auxiliary reservoir and brake-cylinder pressures have equalized, is much greater than it would be if the air from the auxiliary reservoir flowed into an empty brake cylinder. Not only is the final pressure in the brake cylinder greater, but the accretion of pressure therein is more rapid, and the brake pistons are consequently moved outward with greater speed and force."

A suggestion is made that a modification of the compound piston method by which train-pipe air could be sent into the atmosphere was an obvious one, and needed no explanation. That may be true. The air could be sent anywhere, but the means by which atmospheric venting was to be adapted to the other members of serial quick-acting air-brake mechanism would require invention. It is

manifest that the inventor meant to confine himself, in the investigations which resulted in the application of 1892, to the system which he had previously perfected; for, in each of the five modifications which he described, train-pipe air was vented into the brake cylinder, and each of the seven original claims of his application described the brake-cylinder piston as a member of the combination.

The question upon this patent depends, in our opinion, upon the construction which is to be given to the six claims which were introduced by amendment. If they are to be restricted in their character to the mechanism as shown in the specification, it will not be claimed that the defendant is an infringer. It seems clear that the invention was merely an alteration in a pre-existing perfected system, and was not of a primary character. As it was, presented in the specification, it was a departure in respect to the means by which train-pipe air is vented through an emergency port into the brake cylinder, it did not contemplate a radical departure from the standard air brake of No. 376,872, and was intentionally limited to that style of structure. We are therefore of opinion that the claims inserted by amendment in 1895 must be limited to a piston attached to, or moved by, the brake-cylinder piston, for venting the train pipe into the brake cylinder.

The defendant caused its new device, known as "Valve C," to be invented for the purpose of escaping from the Westinghouse system of venting exclusively into the brake cylinder. It vents into the atmosphere, and uses for that purpose a compound piston, which is a part of the triple-valve piston, the action of which is not dependent upon the brake-cylinder piston. The cylinder of one part of the piston was attached to the other part in the form of a cup, and service and emergency operations of the brakes were obtained by very much the mode of operation which has been described with respect to the Westinghouse patent of 1895; that is, the varying speed of the operative piston, rather than its length of movement, was the means by which the vent valve was opened. It follows, from the construction which we have given to the patent of 1895, that the defendant's device, known as "Valve C," is not an infringement.

The Dixon patent was applied for on December 16, 1887, after the issuance of patent 360,070, and before the date of patent 376,837, but after the public had knowledge of the invention described in that patent, and was intended to be an improvement upon No. 360,070, by venting the train pipe into the atmosphere instead of into the brake cylinder. The patentee says in his specification:

"The first and main part of my invention consists essentially in cutting off and dispensing with the passage from the train pipe to the brake cylinder, and locally venting the train pipe directly to the atmosphere, through a passage or port, which is opened by preliminarily lowering the pressure in the train pipe, and closed by a sufficient increase of pressure in the brake cylinder."

He closed the passage in the Westinghouse device which carried the train-pipe air to the brake cylinder, and in lieu of it had a passage with an open-air port, H, to the atmosphere, so that, whenever the valve which covered the port was raised from its seat by the further traverse of the triple-valve piston, the train-pipe air passed out

through this opened port. He closed this venting port, inasmuch as it must be closed in order to release the brakes, by means of the same or another valve, which was actuated by brake-cylinder pressure. It is not contended that the defendant used the Dixon method of closing the port. He filled the brake cylinder with auxiliary reservoir air at or near the time when, by the final traverse of the piston, train-pipe air is vented into the atmosphere. In order to establish the primary character of the invention, stress is laid by the complainant upon the concurrent action of venting into the atmosphere and filling the brake cylinder with auxiliary reservoir air by the further traverse of the triple-valve piston, and it is said that auxiliary reservoir air was for the first time utilized for "quick individual action," while atmospheric venting was used for "serial quick action," and that the discharge from each of the two parts was free from obstruction from the other.

As the specification recognizes that in No. 360,070 a port from the auxiliary reservoir to the brake cylinder was opened by the action of the triple-valve piston when it made its final traverse, there was nothing new in this method of furnishing the brake cylinder with air; and the careful statement of the invention by the complainant simply means that atmospheric venting vented the train pipe quickly and without obstruction. Venting train-pipe air into the atmosphere in automatic air brakes was an old subject of invention when Dixon entered upon it. Its advantage, resulting from the quickness with which the train pipe is vented, was well known, as were also its disadvantages, by reason of the loss of the benefit from the rapid storage in the brake cylinder of train-pipe air, which helped to move the brake pistons promptly and energetically. Mr. Westinghouse has shown a system of venting into the atmosphere in his patent No. 217,838, and described a method in his addition of February 11, 1888, to his French patent No. 182,538, of March 29, 1887. His subsequent application for letters patent of the United States for an invention of the same kind was put in interference with the Dixon application. Priority of invention was decided in favor of Dixon, whose patent was subsequently assigned to the complainant. It has never put the invention into general use, presumably preferring to make the air brake of No. 376,837 its standard quick-action brake.

The defendant vents train-pipe air into the atmosphere by the aid of the triple-valve piston, which has been already generally described, and which does not have the preliminary traverse and the final traverse of the piston of the Westinghouse quick-action brakes. The compound piston of the defendant has but one range of motion.

The Dixon device is presented as a primary invention of importance, and therefore as one which calls upon a court to give a wide range to the territory covered by the patent. We do not thus understand the scope of the alleged improvement. It was an obvious expedient, as a modification of the Westinghouse system, it used the peculiarities of the action of his piston, and was not of an important character. The patent should not have a broad scope, and should not be able to control analogous modes of venting to the atmosphere in different air-brake systems.

Claims 3 and 5 are those which are said to be infringed, and are as follows:

"(3) The combination of the brake cylinder, the train pipe, the car reservoir, and the main valve operating piston with a passage leading from the train pipe to the open air, for locally venting the train pipe to the atmosphere, and a valve which opens said passage when the main valve operating piston opens the emergency port, and which is controlled by the movement of that piston, substantially as described."

"(5) The combination, in a fluid-brake mechanism, of a train pipe, brake cylinder, air reservoir, and a main valve operating piston, B, with a discharge passage leading from the train pipe to the open air, provided with a valve, which is operated by the final movement of the piston, B, in applying the brakes for emergency stops, thereby venting the train pipe to the atmosphere, substantially as described."

The specification shows that the piston which was to do the work in the Dixon device was the Westinghouse piston, which had an ordinary range of motion for a service application of the brakes, and additional range of motion for an emergency application. This piston is obviously the one referred to in claim 5, which speaks of the valve "operated by the final movement of the piston, B, in applying the brakes for emergency stops." Claim 3 is not so definite. Its element which corresponds with the valve of claim 5 is "a valve which opens said passage when the main valve operating piston opens the emergency port." The patentee had in his mind the piston which, in its further traverse, opened the emergency port. In other words, "this piston is an element of both claims," and therefore neither claim is infringed. The decree of the circuit court is affirmed, with costs.

LACOMBE, Circuit Judge (dissenting). I am unable to assent to the proposition that patent No. 538,001 should be restricted as closely as the opinion indicates it should be, and therefore am inclined to hold that defendant has infringed that patent. As to the Dixon patent, I entirely concur.